UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| SAMANTHA GERRARD, | **DECISION and** |
| Plaintiff, | **ORDER** |
| v. | -------------------- |
| | **REPORT** |
| ACARA SOLUTIONS INC., | **and** |
| Defendant. | **RECOMMENDATION** |
| _____ | **18-CV-1041V(F)** |

APPEARANCES:       LAW OFFICES OF STEFAN COLEMAN, P.A.
Attorneys for Plaintiff
STEFAN L. COLEMAN, of Counsel
5 Penn Plaza, 23rd Floor
New York, New York 10001

KAUFMAN P.A.
Attorneys for Plaintiff
AVI R. KAUFMAN, of Counsel
400 NW 26th Street
Miami, Florida 33127

BECKAGE PLLC
Attorneys for Defendant
JENNIFER A. BECKAGE,
MYRIAH V. JAWORSKI, of Counsel
420 Main Street, Suite 1110
Buffalo, New York 14202


**JURISDICTION**

This case was referred to the undersigned for all pretrial matters by Hon.

Lawrence J. Vilardo on December 10, 2018 (Dkt. 6) and is presently before the court on

Defendant's motion to dismiss, filed December 7, 2018 (Dkt. 5), and Defendant's motion

to stay discovery, filed March 6, 2019 (Dkt. 15).

## BACKGROUND

Plaintiff's complaint alleging a class action pursuant to Fed.R.Civ.P. 23(b)(2) based on Defendant's violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 *et seq.* ("the TCPA" or "the Act")) was filed September 20, 2018. Plaintiff seeks statutory damages and injunctive relief on behalf of two nation-wide classes, the first constituting persons receiving Defendant's text messages on their cellular telephones without their consent, the second constituting persons who also received such messages after requesting Defendant cease sending the messages. In lieu of answer, Defendant moved on December 7, 2018, to dismiss the Complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") (Dkt. 5) together with Defendant's Memorandum of Law In Support of its Motion to Dismiss the Complaint (Dkt. 5-1) ("Defendant's motion to dismiss"). The Complaint references (Complaint ¶ 10 n. 2) an August 30, 2012 press release in support of Plaintiff's claims describing a software product, SmartSearch®, used by Defendant in conducting its job recruitment business ("the press release"). Plaintiff's Response To Defendant's Motion To Dismiss was filed January 14, 2019 (Dkt. 9) ("Plaintiff's Response"); Defendant's Reply Memorandum of Law In Support of Defendant's Motion to Dismiss the Complaint was filed January 31, 2019 (Dkt. 13) ("Defendant's Reply") attaching a copy of the press release.

On March 6, 2019, Defendant moved for a protective order staying discovery pending the court's determination of Defendant's motion to dismiss (Dkt. 15) ("Defendant's motion to stay discovery"). On March 13, 2019, Plaintiff filed Plaintiff's Response to Defendant's Motion to Stay (Dkt. 18) (Plaintiff's Response to Motion To

Stay"); on March 15, 2019, Defendant filed Defendant's Reply Memorandum of Law In Support of its Motion to Dismiss [*sic*] to Stay (Dkt. 19) ("Defendant's Reply in Support of Motion to Stay Discovery").[1]  Oral argument was deemed unnecessary.


## FACTS[2]

Defendant is an international staffing and recruiting company headquartered in this district, formally named Superior Talent Resources, Inc., d/b/a The Superior Group. Plaintiff is a resident of Palatine, Illinois.  Plaintiff claims that commencing in early 2018 Defendant sent numerous, 240, text messages to Plaintiff's cellular telephone number without Plaintiff's consent informing Plaintiff of a potential job opportunity, *viz.*, "material handler/production operator," with an unidentified company, ostensibly one of Defendant's business clients, located, according to Defendant (Dkt. 5-1 at 8), in Buffalo Grove, Illinois ("Buffalo Grove") which Defendant states was located within 10 miles of Plaintiff's residence.  *Id.*  On July 10, 2018, Plaintiff, who had no prior relationship with Defendant and had, as Plaintiff alleged, Complaint ¶¶ 14, 22, never consented to receive Defendant's messages, responded to Defendant's text messages at 12:43 p.m. by requesting Defendant cease sending them to her.  Complaint ¶ 19.  Plaintiff further alleges that thereafter on July 10, 2018, Defendant sent more than 201 similar messages using an autodialer despite Plaintiff's text response informing Defendant that Plaintiff was not interested in the described job with the putative employer located in

---

[1]  A motion for a protective order pursuant to Fed.R.Civ.P. 26(c) to stay discovery is non-dispositive, *see Blond v. Bradt*, 2015 WL 1472152, at *1 (W.D.N.Y. Mar. 31, 2015) (considering motion for protective order non-dispositive), Defendant's motion to stay discovery which is closely related to Defendant's motion to dismiss is addressed in this combined Decision and Order and Report and Recommendation.
[2]  Taken from the pleadings and papers filed in this action.

Buffalo Grove.  Complaint ¶ 18. The Complaint includes copies of nine screenshots[3] of Defendant's messages on July 10, 2018 as exemplars of the unwanted messages and a screenshot of Plaintiff's demand Defendant cease sending the messages.  Complaint ¶¶ 18, 20.  The messages sent prior to Plaintiff's request that Defendant cease sending her the messages included a telephone number (844-244-4966) ("the 844 number") which Plaintiff asserts is associated with non-party Advanced Personnel Systems, Inc. ("APS"), maker of SmartSearch® ("SmartSearch"), a job recruiting software product used by Defendant to engage in "mass-text solicitations for job-openings to consumers," Complaint ¶ 10, like Plaintiff.  Plaintiff supports this allegation by referencing the press release available at https://www.prweb.com/releases/2012/8prweb9851425.htm. (Complaint ¶ 10 n. 2).  Each of the screenshots of Defendant's text messages at issue included the name of one Amy Jones as a person at Superior Group without any additional contact information other than the 844 number.

After Plaintiff's demand sent on July 10, 2018 to the 844 number at 12:43 p.m. that Defendant cease sending her the messages, numerous additional messages were received, notwithstanding Plaintiff's request to stop, by Plaintiff from Defendant which included the 844 number and an additional phone number for Amy Jones, 952-955-7145, for Plaintiff to call or text if she were "interested" in the job described in Defendant's messages.  Complaint ¶ 20.  According to Plaintiff, on information and belief, Defendant also sent "substantively identical unsolicited text messages *en masse* to the cellular telephone numbers of thousands of consumers."  Complaint ¶ 23.

---

[3]  Screenshot is the term used to describe the action of capturing your computer desktop or anything shown on your computer screen to a static image file. In other words, it's a way of taking a snapshot or picture of whatever is showing on your computer, mobile, or tablet screen at the time. https://www.lifewire.com/what-is-a-screenshot-1701742, *last visited* June 26, 2019.

Plaintiff further alleges that Defendant, or a third-party acting on behalf of Defendant (presumably APS using the SmartSearch software), used "an automatic telephone dialing system ("ATDS"), hardware and/or software with the capacity to store or produce cellular telephone number[*sic*] to be called, using a random or sequential number generator," to send the alleged unwanted text messages.  Complaint ¶ 24. Plaintiff asserts that Defendant's use of an ATDS is shown by "the circumstances surrounding the [Defendant's][4] text messages, including the text messages' commercial and generic content, that substantively identical texts were sent to multiple recipients, that multiple texts were sent to the same recipient and that they were sent from a long-code, which is consistent with the use of an automatic telephone dialing system to send text messages."  Complaint ¶ 24.  Plaintiff concludes that based on the foregoing allegations, Defendant have violated the TCPA, specifically § 227(b)(1)(A)(iii).

## DISCUSSION

1.    <u>Motion to Dismiss</u>.

A complaint, to survive a motion to dismiss pursuant to Fec.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"), "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).  "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678); *see*

---

[4]   Unless indicated otherwise, all bracketed material is added.

*Twombly*, 550 U.S. at 570 (the complaint must plead "enough facts to state a claim to relief that is plausible on its face").  The complaint's factual allegations "must be enough to raise above the speculative level on the assumption that all the allegations in the complaint are true."  *Twombly*, 550 U.S. at 570.  *See Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (reviewing motion to dismiss under 12(b)(6), "accepting as true the factual allegations in the complaint and drawing all references in the plaintiff's favor").

The "plausibility standard" applicable to a Rule 12(b)(6) motion to dismiss "is guided by '[t]wo working principles.'"  *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (citing *Twombly*, 550 U.S. at 544 (2007), and quoting *Iqbal*, 566 U.S. at 678).  "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  *Id.* at 72 (quoting *Iqbal*, 556 U.S. at 678).  "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Unless the plaintiff pleads "enough facts to state a claim that is plausible on its face" so as to "nudge[ ] their claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly,* 550 U.S. at 570.

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), "a court may consider the complaint as well as 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference.  *Kalyanaram v.*

*American Ass'n of University Professors at New York Institute of Technology, Inc.,* 742

F.3d 42, 44 n. 1 (2d Cir. 2014) (quoting *Yak v. Bank Brussels Lambert*, 252 F.3d 127,

130 (2d Cir. 2001)). A court may also consider "matters of which judicial notice may be

taken, [and] documents either in plaintiff's possession or of which plaintiffs had

knowledge and relied on in bringing suit.'" *Id.* (quoting *Chambers v. Time Warner, Inc.*,

282 F.3d 147, 153 (2d Cir. 2002)).

2. <u>Plaintiff's TCPA Claim</u>.

In order to protect consumers from the then proliferation of nuisance

telemarketing phone calls seeking to "'market goods and services to the home and

other businesses,'" Congress enacted in 1991 the TCPA. *ACA Int'l v. FCC*, 885 F.3d

687, 692 (D.C.Cir. 2018) (quoting Pub.L. No. 102-243 §§ 2(1), (6)-(7)). As relevant to

the instant case, the TCPA prohibits "any person from "mak[ing] <u>any call</u>[5] [without the

prior express consent of the party called] using any automatic telephone dialing system

. . . to any telephone number assigned to a . . . cellular telephone service . . . for which

the called party is charged for the call."[6] 47 U.S.C. § 227(b)(1)(A)(iii) ("§

227(b)(1)(A)(iii").[7] An automatic telephone dialing system is defined by the Act as

"equipment which has the capacity (A) to store or produce telephone numbers to be

called, using a random or sequential number generator; and (B) to dial such numbers."

47 U.S.C. §§ 227(a)(1) ("§ 227(a)(1)") ("an ATDS" or "autodialer").[8] The term "capacity"

---

[5] Unless indicated otherwise, all underlining added.
[6] Plaintiff does not specifically allege Plaintiff was billed by her cellular phone carrier for Defendant's calls, however, Defendant does not assert this as a ground to dismiss.
[7] Unless otherwise indicated all underlining added.
[8] The Act also prohibits artificial or pre-recorded voice messages to residential telephone lines, 47 U.S.C. § 227(b)(1)(B); using a telephone facsimile machine ("fax"), computer, or other device to send an "unsolicited advertisement" to a telephone fax machine, 47 U.S.C. § 227(b)(1)(C), and using "an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously." 47 U.S.C. § 227(b)(1)(D).

as used in § 227(a)(1) refers "to a device's current functions, absent any modification to the device's hardware or software." *King v. Time Warner Cable, Inc.*, 894 F.3d 473, 481 (2d Cir. 2018). Violations of the TCPA may be addressed in a private action resulting in damages of $500 per violation and treble damages in the case of willful or knowing violations. 47 U.S.C. § 227(b)(3). *See Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368, 386-87 (2012) (holding because the plaintiff's claims for relief were asserted pursuant to the TCPA, a federal statute, there was federal question jurisdiction over such claims in federal court). Text messaging to a cellular telephone number is within the scope of the term to "make any call" as that term appears in § 227(b)(1)(A). *See Krady v. Eleven Salon Spa*, 2017 WL 6541443, at *3 (E.D.N.Y. July 28, 2017) ("[I]n this Circuit district courts have treated text messages as "calls" within the meaning of the TCPA) (citing cases), *report and recommendation adopted*, 2017 WL 6542462 (E.D.N.Y. Dec. 21, 2017). The Act also authorizes the Federal Communications Commission ("FCC") to issue regulations to "implement the requirements of" § 227(b)(1). 47 U.S.C. § 227(b)(2). As relevant, 47 C.F.R. § 64.1200(a)(2) ("§ 64.1200(a)(2)") prohibits any telephone call, using an ATDS without the express prior written consent of the called party, to any cellular telephone service number "that includes or introduces an advertisement or constitutes telemarketing . . .." The FCC regulations, to which the courts are required to give deference under the Hobbs Act, 28 U.S.C. § 2342(a), *see King v. Time Warner Cable, Inc.*, 894 F.3d 473, 476 n. 3 (2d Cir. 2018) (noting validity of FCC regulations is reviewable only in federal courts of appeal); *see CE Design Ltd v. Prison Bus Media, Inc.*, 606 F.3d 443, 446-5 (7th Cir. 2010), define "telemarketing" as a "call or message for the purpose of encouraging the purchase or rental of, or investment in, property,

goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). The term "advertisement" is similarly defined in 47 C.F.R. § 64.100(f)(1) ("The term advertisement" means any material advertising the commercial availability or quality of any property, goods, or services."). Whether the text message at issue constitutes "telemarketing" or an "advertisement" is relevant only to whether prior express <u>written</u> consent was required to be given by the party called. *See* § 64.1200(a)(2) (text message which includes or "introduces an advertisement or constitutes telemarketing" via telephone call using autodialer prohibited other than a call made with "the prior express written consent of the called party."). If the text message is an advertisement or telemarketing prior express <u>written</u> consent is therefore required to avoid TCPA liability.

Defendant asserts two grounds in support of Defendant's motion to dismiss: (A) Plaintiff's allegations demonstrate the subject of Defendant's text messages concerned an "informational employment opportunity," not telemarketing or a commercial advertisement, and therefore cannot constitute a violation of the TCPA, Dkt. 5-1 at 11; Dkt. 13 at 6-8, and (B) Plaintiff's allegations, including those based on the press release, do not support an inference Defendant's text messages were sent to Plaintiff using an ATDS. Dkt. 5-1 at 14-18; Dkt. 13 at 8-14.

A.    <u>Defendant's Recruitment Messages</u>.

Defendant cites to no caselaw within the Second Circuit supporting Defendant's contention that job recruiting or employment opportunity calls such as those at issue in this case are exempt from the requirements of the TCPA, and the court's research reveals none to date. Moreover, based on the court's review, Defendant's reliance, Dkt.

5-1 at 10, 12; Dkt. 13 at 6-8, on caselaw holding that text messages from employment recruiters like Defendant describing potential job opportunities are exempt from liability under TCPA, *see, e.g. Dolemba v. Illinois Farmer Ins. Co.*, 2015 WL 4727331, at *2 (N.D. Ill. Aug. 10, 2015) (Durkin, J.), cited by Defendant, Dkt. 5-1 at 12, because they are neither advertising nor a form of telemarketing, is misplaced as neither the TCPA itself nor the FCC's implementing regulations provide for any such exemption.  First, no such exemption appears on the face of the TCPA itself.  *See King*, 894 F.3d at 477 ("'Every exercise in statutory construction must begin with the words of the text [of the statute].'") (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003)). Instead, 47 U.S.C. § 227(b)(1)(iii) broadly prohibits "<u>any</u> call (other than a call made for emergency purposes or made with the prior express consent of the called party) using [an autodialer] . . . to a [cellular telephone number] for which the called party is charged for the call."  ("§ 227(b)(1)(iii)").  Further, as noted, Discussion, *supra*, at 8, § 64.1200(a)(2) provides that to avoid TCPA liability a cell phone call which "includes or introduces an advertisement or constitutes telemarketing" requires "prior express <u>written</u> consent" which, in the absence of such consent, constitutes a violation of § 227(b)(1)(A)(iii).  *See* 47 C.F.R. § 64.1200(a)(1).  As such, § 64.1200(a)(2) does not provide for an exemption based on the text message as constituting a job recruitment. *See Dolemba v. Kelly Services, Inc.*, 2017 WL 429572, at *2 n. 2 (N.D.Ill. Jan. 31, 2017) (Ellis, J.).[9]  In this later, 2017, *Dolemba* case, Judge Ellis noted some courts, including Judge Durkin's decision in the earlier, 2015, *Dolemba* I case, on which Defendant relies,

---

[9]   Despite involving plaintiffs with the same surname in both cases, this, later, *Dolemba* case ("*Dolemba* II"), decided by a different District Judge, Hon. Sara L. Ellis, involves a different plaintiff than the plaintiff who brought the, earlier, 2015, *Dolemba* case ("*Dolemba* I") decided by Hon. Thomas M. Durkin.

erroneously consider that the inclusion of advertising or conduct constituting telemarketing in a text message is prerequisite to TCPA liability under § 227(b)(1)(A)(iii) for a text message call made to a cellular phone. *Dolemba* II, 2017 WL 429572, at *2 n. 2. Specifically, Judge Ellis in *Dolemba* II explained that "a plain reading of the [TCPA] statute reveals that liability for calls made to <u>cellular</u> <u>phones</u> under § 227(b)(1)(A)(iii), as opposed to calls made to <u>landlines</u> under § 227(b)(1)(B) <u>or</u> <u>faxes</u> under § 227(b)(1)(C), does not depend on the calls being telemarketing or advertising, which the FCC has confirmed in a 2015 ruling." *Id.* (citing and quoting *In re: Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("the 2015 Order"), 30 FCC Rcd. 7961, 2015 WL 4387780 (July 10, 2015) ¶ 4 ("TCPA and implementing rules prohibit 'making any non-emergency call using an automatic telephone dialing system ('autodialer') or an artificial or prerecorded voice to a *wireless* telephone number without prior express consent") (italics in original); *id.* ¶ 123 ("affirming that the TCPA '<u>broadly</u> <u>prohibits</u>' calls using ATDS to any cellular phones '<u>without</u> <u>limiting</u> <u>that</u> <u>restriction</u> <u>to</u> <u>telemarketing</u> <u>calls</u>'"). *Id. See also* 47 U.S.C. § 227(b)(2)(B) authorizing FCC rules or orders to exempt from the requirements of § 227(b)(1)(B) (prohibiting unconsented telephone calls to a "<u>residential</u> <u>telephone</u> line" except in the case of an emergency or an attempt to collect a debt owed to the United States); *Aranda v. Caribbean Cruise Linc, Inc.*, 179 F.Supp.3d 817, 825-26 (N.D.Ill. 2016) ("*Aranda*") ("'non-telemarketing, informational calls . . . <u>require</u> <u>either</u> <u>written</u> <u>or</u> <u>oral</u> <u>consent</u> <u>if</u> <u>made</u> <u>to</u> <u>wireless</u> <u>consumers</u>.'" (quoting *In re Rules & Regulations Implementing the Tel. Consumers Prot. Act of 1991*, 27 F.C.C.R. 1830, 1841 ¶ 28 (2012)).[10] Such FCC rulings, as noted, are

---

[10]  In *Aranda*, the court also rejected defendant's suggestion that the exemption available for unconsented calls to residential landlines pursuant to 47 C.F.R. § 64.1200(a)(3) be judicially extended to

binding of the courts.  *See* Discussion, *supra*, at 8.  It therefore appears that the

caselaw upon which Defendant relies (Dkt. 9 at 4; Dkt. 13 at 7) (*e.g. Dolemba* I) for

Defendant's contention that text messages by a job recruiter, like Defendant, to a

potential candidate identified by Defendant, like Plaintiff, for a possible job opportunity

such as the one which is the subject of the Defendant's text messages as Plaintiff has

alleged, are not covered by the TCPA, because such sender is not a telemarketer and

the subject message is not an advertisement, are incorrect and, as such, should not be

followed.

    In *Dolemba* I, 2015 WL 4727331, at *2, relied on by Defendant, Dkt. 5-1 at 12, 4,

in dismissing the complaint alleging a TCPA violation based on defendant's unsolicited

telephone message to plaintiff's cell phone proposing plaintiff's attendance at a

business opportunity, *i.e.*, working as an insurance agent for defendant to be explained

at an informational meeting, the court, in holding a job recruitment call not actionable

under the TCPA relied on 47 C.F.R. § 64.1200(a)(2).  This regulation, however, does

not, contrary to the *Dolemba* I court's suggestion, exempt such calls from the prohibition

as stated in both the TCPA, § 227(b)(1)(A) and the cited regulation, 47 C.F.R. §

64.1200(a)(1)(iii) which generally prohibits <u>any</u> phone call . . . using an . . . [autodialer]

"without the prior express consent of the called party" to "any . . . cellular" telephone

service number, except as provided in § 64.1200(a)(2) which requires express prior

written consent if the calls are advertising or telemarketing in nature.  Thus, the

regulation correctly read and understood, as carefully explained by Judge Ellis in

---

calls to cellular phones as not authorized by the TCPA or FCC regulations.  *See Aranda*, 179 F.Supp.3d at 825-26 (expressing doubt the FCC could extend such exemption to cellular calls except where the uninvited calls are not charged to the receiving party and citing 47 U.S.C. § 227(b)(2)(C)).

*Dolemba* II, 2017 WL 429672, at *2 n. 2, Discussion, *supra*, at 10-11 does not exempt

from potential TCPA liability calls which do not constitute advertising or telemarketing;

rather, § 64.1200(a)(2) requires that to avoid any TCPA liability for such calls the caller

must have obtained "the <u>prior</u> <u>express</u> <u>written</u> <u>consent</u> of the called party <u>or</u> the prior

express consent of the called party" if called by a tax-exempt non-profit

organization . . .."

    Significantly, the only FCC regulations authorized by the TCPA to "exempt"

certain non-commercial calls from the TCPA are limited to calls made to a "<u>residential</u>

<u>telephone line</u> using prerecorded voice to deliver messages prohibited by §

227(b)(1)(B)."  47 U.S.C. § 227(b)(2((B) (authorizing FCC regulations to exempt from

"paragraph (a)(B) of <u>this</u> <u>subsection</u>" non-commercial calls or commercial calls that the

FCC finds "will not adversely affect the privacy rights that this section [§ 227] is intended

to protect" and does "not include the transmission of any unsolicited advertisement.")  §

227(b)(2)(B)(i), (ii)(I), (II).  The FCC has implemented this provision by promulgating 47

C.F.R. § 64.1200(a)(3) which exempts calls to a "<u>residential</u> <u>line</u>" using an artificial or

prerecorded voice to deliver a message "without the prior express written consent of the

called party," unless the call is not for a commercial purpose, or if for a commercial

purpose, does not include any "advertisement or constitute telemarketing."  ("§

64.1200(a)(3)").  By definition, a "residential telephone line" is not a cellular telephone

allegedly used by Plaintiff in this case and, as such, § 64.1200(a)(3) is irrelevant to the

merits of Defendant's motion to dismiss.  Thus, the potential exemptions for commercial

phone calls including telemarketing or advertising, which could conceivably include job

opportunity information such as those sent by Defendant, pertains solely to calls to

residential telephone numbers, not to cell phones as alleged in this case, and are limited to "artificial or prerecorded voice" messages, not text messages as alleged in this case.

Defendant's further reliance, Dkt. 5-1 at 10, 12, Dkt. 13 at 7, on *Gary v. TrueBlue Inc.*, 2018 WL 3647046, at *9 (E.D.Mich. Aug. 1, 2018) ("*Gary*"), as also supporting Defendant's contention that "employment opportunity messages are generally not actionable under the TCPA" is based on a misunderstanding of the court's decision in *Gary* as a careful reading of the court's decision shows the court in *Gary* did not so state. Rather, contrary to Defendant's assertion, the court in *Gary*, as the court's holding in *Dolemba* II demonstrates, Discussion, *supra*, at 10-11, 12, held only that the FCC's requirement of an "express written consent" to avoid TCPA liability applies only to telemarketing calls, not informational calls which the court found nevertheless require prior consent. *Gary*, 2018 WL 3647046 at *9. Defendant's quotation from *Gary*, Dkt. 13 at 7, that "employment opportunity texts . . . do not qualify as telemarketing as a matter of law," in support of Defendant's opening contention that such calls fall outside the requirements of the TCPA, represents a wholly unsupported interpretation of the *Gary* decision as the court in *Gary* addressed this issue – whether the defendant's calls constituted telemarketing – only in relation to whether plaintiff's express prior written consent had, for summary judgment purposes, been required. *Gary*, 2018 WL 3647046, at *10 ("Consequently, the Court also cannot conclude that the consent [p]laintiff provided . . . is invalid.").[11] That, contrary to Defendant's contention, the *Gary*

---

[11] In *Gary*, plaintiff had provided express prior written consent to defendant's predecessor, a staffing company that connected workers with short-term jobs, which consent plaintiff claimed had expired thereby requiring the court deny plaintiff's request for summary judgment because of a material issue of fact as to whether defendant's messages constituted telemarketing. *Id.*

court's holding does not hold or imply there exists under the TCPA a general exemption for job recruitment text messages to cell phones, like those at issue in this case, is underscored by the *Gary* court's careful analysis of whether the plaintiff's prior consent precluded TCPA liability in that case. *See Gary,* 2018 WL 3647046 at ** 8-10. Moreover, as is also clear from the court's discussion in *Gary*, had it found, as Defendant mistakenly believes, that such non-telemarketing text messages, *i.e.*, for employment recruitment, were not subject to the TCPA, any issue regarding the nature of one receiving party's consent would have been irrelevant.

Defendant's reliance on the other cases cited by Defendant in support of Defendant's contention that as job recruitment related communications Defendant's text messages are exempt from TCPA liability, Dkt. 5-1 at 12, is equally unavailing. In *Murphy v. DCI Biologicals Orlando, LLC*, 2013 WL 6865772, at **9-10 (M.D.Fla. Dec. 31, 2013) the court relied on 47 C.F.R. § 64.1200(f)(14) (defining a "telephone solicitation") ("§ 1200(f)(14)") to conclude that defendant's text messages soliciting plaintiff to sell his blood to defendant did not constitute a "telephone solicitation," as defined in § 1200(f)(14), because it was not for the purpose of encouraging "the purchase or rental of, or investment in property, goods, or services." § 64.1200(f)(14). However, the term "telephone solicitation," as it appears in § 1200(f)(14), relates only to the FCC's rule-making authority, granted by the TCPA, to "protect <u>residential</u> <u>telephone</u> <u>subscribers</u>' privacy rights to avoid receiving telephone solicitation to which they object." 47 U.S.C. § 227(c)(1). As such, this term has no relevance to a TCPA claim involving calls to mobile cellular phone arising under § 227(b)(1)(A)(iii) as alleged in this case. *Reardon v. Uber Technologies, Inc.*, 115 F.Supp.3d 1090, 1094-95 (N.D.Cal. 2015)

("*Reardon*") is also inapposite as in that case the court determined that as defendant's driver recruitment messages did not constitute advertising or telemarketing, plaintiff's prior express written consent was not required to avoid potential TCPA liability. Thus, the court in *Reardon* did not conclude, as Defendant asserts, Dkt. 5-1 at 14, ("Consequently, the court should hold as a matter of law that the 'mere recruitment [text message] at issue here is not actionable' under the TCPA.") (citing *Dolemba* I, 2015 WL 4727331, at *2) that recruitment messages are not covered by the TCPA. Rather, the court in *Reardon* held that to prevail on its motion to dismiss, "Uber [defendant] needs only to show that . . . plaintiffs provided 'prior express consent' to receive the texts at issue," not prior <u>written</u> express consent that would be required if the messages did constitute advertising or telemarketing. *Reardon*, 115 F.Supp.3d at 1097. As such, *Reardon* provides no support for Defendant's assertion that "mere [job] recruitment message[s]" are not actionable under the TCPA even if the recipient has not, as Plaintiff alleged, provided such "prior express consent."

The other cases relied upon by Defendant, Dkt. 5-1 at 12, for Defendant's erroneous proposition that Defendant's job recruitment messages are not subject to the TCPA are consistent with the court's foregoing analysis and accordingly provide no support to Defendant's motion to dismiss. Specifically, in *AL and PO Corporation v. Med-Care Diabetic & Med. Supplies, Inc.*, 2014 WL 6999593, at *2 (N.D.Ill. Dec. 10, 2014) the court dismissed plaintiff's TCPA complaint brought under § 227(b)(1)(C) (prohibiting facsimile ("fax") messages which include unsolicited advertisements), finding that the defendant's messages proposing a job opportunity nevertheless constituted commercial advertisement because defendant's proposal sought to sell its

products sufficient to sustain the complaint in that case. Such determination was required in *AL and PO Corporation*, 2014 WL 6999593, at *2, because in that case, unlike the instant case, the complaint involved a fax for an unsolicited advertisement prohibited by § 227(b)(1)(C) unless exempted from the TCPA, for example, by virtue of a prior business relationship as provided by § 227(b)(1)(C)(i). Thus, this case is also inapposite to Plaintiff's claim alleging a violation of § 227(b)(1)(A)(iii) under which TCPA liability does not depend on whether the unconsented text message involved an "unsolicited advertisement," sent by fax, as required by § 227(b)(1)(C). Similarly, in *Friedman v. Torchmark Corp.*, 2013 WL 4102201, at *5 (S.D.Cal. Aug. 13, 2013) ("*Friedman*") plaintiff alleged defendant called plaintiff on plaintiff's residential home telephone with a pre-recorded message to solicit plaintiff's attendance at a "webinar" which could develop into a job opportunity selling defendant's insurance products. Because the complaint in *Friedman* alleged a violation of § 227(b)(1)(B) (prohibiting a prerecorded phone call <u>to a</u> <u>residential</u> <u>line</u> without consent unless exempted by FCC regulation), the court was required to determine whether the message at issue was exempted by 47 C.F.R. § 64.1200(a)(2)(iii) (2011) (amended 2012) ("§ 64.1200(a)(2)(iii)"), as not constituting an "unsolicited advertisement or . . . a telephone solicitation."[12] Finding the defendant's message to a residential line was like an offer of employment and not advertising of a commercial nature the court found it was exempt from TCPA liability. *Friedman*, 2013 WL 4102201, at *4. Thus, as in the instant case Plaintiff's claim is brought under § 227(b)(1)(A)(iii), it is not exempt under the former FCC regulation § 64.1200(a)(2)(iii) (now § 64.1200(a)(3)(iii)) rendering *Friedman*

---

[12]  The regulation was amended in 2012 to include a new § 64.1200(a)(2); former § 64.1200(a)(2)(iii) was renumbered § 64.1200(a)(3)(iii). *See* 77 FR 34233-01, 2012 WL 2062573 (Jun. 11, 2012).

inapposite. *Lutz Appellate Services, Inc. v. Curry*, 859 F.Supp. 180, 181-82 (E.D.Pa. 1994) is also inapposite as in that case, like *AL and PO Corporation*, the claim based on an unwanted fax was asserted under § 227(b)(1)(C) which, as discussed, Discussion, *supra*, at 16-17, requires a showing that such fax message constituted an unsolicited advertisement. In *Lutz*, the court found the alleged fax was in the nature of a job opportunity and not a commercial advertisement and the message was thus exempt from liability under § 227(b)(1)(C). Because in the instant case, messages to cellular phones, such as Plaintiff's, without express prior consent are squarely prohibited by § 227(b)(1)(A)(iii) regardless of whether they involve job recruitment and without any additional element of being a commercial advertisement message, *Lutz* equally lends no support to Defendant's motion to dismiss. Further, in *Payton v. Kale Realty, LLC*, 164 F.Supp.3d 1050, 1062 (N.D.Ill. 2016) (citing by Defendant at Dkt. 5-1 at 13), the court correctly concluded that as the text message at issue was not advertising nor telemarketing only plaintiff's prior express consent was required to avoid TCPA liability, not prior express written consent. *See Payton*, 164 F.Supp.3d at 1063-64. Thus, like *Murphy* and *Reardon, see* Discussion, *supra,* at 15-16, *Payton* does not hold, contrary to Defendant's assertion, that simply because a call to a cell phone using an autodialer does not constitute an advertisement or telemarketing based on the call's offering of a job opportunity, it is somehow exempt from the TCPA's prohibition. This conclusion is consistent with a recent decision of this court, *Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC*, 2019 WL 296753, at *2 (W.D.N.Y. Jan. 23, 2019) (Vilardo, J.) in which the court held that where the <u>fax</u> messages at issue did not constitute an "unsolicited advertisement" it was not a violation of§ 227(b)(1)(C). In sum, none of the

cases relied on by Defendant supports the proposition, advanced by Defendant, that assuming the Defendant's text messages are solely in the nature of job recruitment, and not some form of commercial advertising or telemarketing, they are exempt from liability under the TCPA.

Nor is there any merit in Defendant's contention, propounded as a rebuttal to Plaintiff's analysis of this issue, *see* Dkt. 9 at 4 (arguing that whether a message constitutes an advertisement or telemarketing is relevant for TCPA purposes only to the degree of prior consent (express written or unwritten) required to avoid TCPA liability), that the Complaint fails to "introduce" the issue of consent, Dkt. 13 at 7, and, therefore, notwithstanding Plaintiff's opposition, Dkt. 9 at 4, on this basis the Complaint fails to plausibly state a claim.  In this circuit, "to prove that a defendant violated the TCPA in a case involving a cell phone, a plaintiff must establish that (1) the defendant called his or her cell phone, and (2) the defendant did so using an ATDS or an artificial or prerecorded voice."  *Krady*, 2017 WL 6541443, at *2 (quoting *Levy v. Receivable Performance Mgmt., LLC,* 972 F.Supp.2d 409, 417 (E.D.N.Y. 2013)).  "'Prior express consent' [of the called party] to receive the calls is 'an affirmative defense to an alleged TCPA violation, for which the defendant bears the burden of proof.'"  *Id.* (quoting *Levy*, 972 F.Supp.2d at 417 and referencing *In the Matter of Rule & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd.  559, 565 (2008), 2008 WL 65485).  It is familiar law that affirmative defenses are to be pleaded in the answer, not the complaint.  *See* Fed.R.Civ.P. 12(b) ("Every defense to a claim for relief must be asserted in the responsive pleading if one is required.")  *See Sompo Japan Ins. Co. of America v. Norfolk Southern Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014) (generally,

failure to plead an affirmative defense in the answer waives the defense which is then excluded from the case). Here, Plaintiff has alleged the disputed text messages were sent by Defendant without Plaintiff's consent and despite Plaintiff's requests to stop. Complaint §§ 3, 4, 16, 17, 22. Although Plaintiff alleged, unnecessarily, the text messages were sent without Plaintiff's "prior express consent," Complaint ¶ 22, Plaintiff has not included sufficient facts in support of such allegations permitting the court to consider the merits of Plaintiff's allegations, *McKenna v. Wright*, 386 F.3d 432, 435-36 (2d Cir. 2004) (citing, *inter alia, Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir. 1998) (an affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint.")). Here, Plaintiff's bare allegations, Complaint ¶¶ 14, 22, that Defendant, prior to sending the messages, did not obtain Plaintiff's prior express consent, do not provide a sufficient basis upon which, absent discovery as to actual facts and circumstances of Defendant's failure to obtain such prior consent, the court cannot properly determine the merits of such potential defense based on the generalized allegations set forth on the face of the Complaint. *See McKenna*, 386 F.3d at 435-36 (permitting defendant to assert affirmative defense, not raised in answer, on motion to dismiss pursuant to 12(b)(6) provided the defense is based on facts appearing on face of complaint). Defendant will therefore be required to include in its answer that Plaintiff authorized the text messages, and thus potentially consented to receipt of the messages, by Plaintiff's participation in a job seekers' website not related to Defendant as Defendant has asserted, Dkt. 5-1 at 5, 7, 18; Dkt. 13 at 8, 12-13, in Defendant's answer should Defendant's motion to dismiss be denied as recommended. *See*

Fed.R.Civ.P. 12(b) (listing defenses which may be raised by motion). Thus, as the advertising or telemarketing character of the call is relevant only to the level of the consent – express prior or express prior written – required to authorize such a call, it was not necessary for Plaintiff to plead more specific facts to address the nature of Defendant's text messages (advertisement or telemarketing) to support Plaintiff's argument, in opposition to Defendant's motion to dismiss, that the TCPA provides no 'safe harbor' from TCPA liability for Defendant's text messages even assuming they were in fact for job recruitment purposes only and that whether such messages constitute advertisement or telemarketing is relevant only to whether the caller had obtained the recipient's express prior written consent as § 64.1200(a)(2) provides. Accordingly, Defendant's contention that dismissal is required because the messages at issue are not telemarketing or advertising, as defined in the TCPA and applicable FCC regulations and thus outside the scope of § 227(b)(1)(A)(iii), is without merit.

B.      ATDS.

The court thus turns to whether Plaintiff has plausibly pleaded that the text messages were sent to Plaintiff's cell phone by an ATDS as required by § 227(b)(1)(A). Defendant contends Plaintiff has failed to do so "because the content and context of the alleged messages support only one plausible inference: direct targeting [of Plaintiff] following human intervention." Dkt. 5-1 at 14; Dkt. 13 at 8 ("[t]he content and context of the allegedly infringing text message do not provide a plausible basis or reasonable inference that an ATDS was used"), which, Defendant contends, precludes use of an autodialer. *Id.* More specifically, according to Defendant, the press release as referenced and relied on by Plaintiff in the Complaint, Complaint ¶ 10 n. 2, and thus

constitutes a document that may be considered by the court on Defendant's motion to dismiss, see *Kalyanaram,* 742 F.3d at 44, n.1, and provides no indicia that the software package it describes, SmartSearch®, which Defendant appears to concede, Dkt. 5-1 at 5 ("Plaintiff is aware . . . [Defendant] uses 'SmartSearch'"), was utilized by Defendant in sending Plaintiff the text message as Plaintiff alleges, has, in addition to its other functionalities as described in the press release, the capacity to also function as an ATDS as that term is defined by the TCPA, or that it was actually used by Defendant as an autodialer in sending the alleged text messages to Plaintiff.  Dkt. 5-1 at 16-17; Dkt. 13 at 8, 12.  First, Defendant asserts the press release shows that the Defendant's use of the SmartSearch platform resulted in the text messages sent to Plaintiff that were "individually and manually inputted into the SmartSearch platform by a Superior employee."  Dkt. 13 at 12-13.  Defendant therefore contends that the press release's description of SmartSearch and its alleged use by Defendant demonstrates the text messages were not generic in content, a characteristic of an unwanted text message which is accepted by courts as an indication of use of an ATDS, *see Flores*, 685 Fed.Appx. at 534 (sending of "<u>generically</u> formatted" texts a persuasive indicator of defendant's use of an autodialer); *Krady*, 2017 WL 6541443 at *4 ("identical, <u>generic</u>, impersonal" text messages relevant to indicate of use of autodialer (citing *Flores*), but were "uniquely targeted because of [Plaintiff's] location, credentials, and job seeking status."  *Id.* at 13.

A fair reading of the press release, however, reveals no definitive indication that Defendant used, or did not use, an autodialer to send text messages to Plaintiff, as part of or in addition to the SmartSearch software, regarding the functions it performs to

support the conduct of Superior's business.  First, according to the press release, the

SmartSearch software program provides "integration [connectivity] with leading job

boards . . . which enables Superior to post jobs to many external sites such as

Monster.com and CareerBuilder – [ the one ostensibly used, according to Defendant, by

Plaintiff] and search their resume data bases."  Dkt. 13-1 at 1. The press release also

states that SmartSearch and Superior developed a "custom integration" capability that

facilitates the flow of critical information from SmartSearch into [Superior's] SAP."[13]  In

addition, according to the press release, SmartSearch "supports integration with many

internal and external applications such as Outlook[14] and virtually any email server, as

well as VoIP,[15] text messaging . . . and more."  *Id.* at 2.  Thus, the press release

supports an inference that Defendant uses SmartSearch to post on the Internet job

opportunities on behalf of Defendant, to search outside sources, *i.e.*, databases, in

order to identify potential job seekers who may be interested in responding to such

postings, or who have themselves posted their resumés, and match the resumés of

these prospects with descriptions of job openings which Defendant's clients wish to fill

through Defendant's service and, where Defendant's software has detected a potential

'match,' communicate these job opportunities to a potential hiree.  The press release

also supports the inference that such information, obtained by Defendant using

---

[13]  SAP SE is one of the largest vendors of enterprise resource planning (ERP) software and related enterprise applications. The company's ERP system enables its customers to run their business processes, including accounting, sales, production, human resources and finance, in an integrated environment. The integration ensures that information flows from one SAP component to another without the need for redundant data entry and helps enforce financial, process and legal controls. It also facilitates the effective use of resources, including manpower, machines and production capacities. https://searchsap.techtarget.com/definition/SAP, *last visited*, June 26, 2019.
[14]  Outlook is a widely used web-based suite of webmail, contacts, tasks, and calendaring services from Microsoft.  https://en.m.wikipedia.org/wiki/Microsoft_Outlook, *last visited*, June 26, 2019.
[15]  VOIP is a method of providing voice communications through the internet.  Wikipedia https://en.wikipedia.org/wiki/voice_over_IP, *last visited*, June 26, 2019.

SmartSearch, from such Internet-based job boards, is routinely downloaded into Defendant's internal computerized database in order to facilitate Defendant's staff in communicating with the job seeker by calling a land line telephone number or, as alleged in this case, text messaging the target job seeker's cell phone number using an autodialer, in order to facilitate a job-seeker in contacting the Defendant's client to pursue a potential hiring which, the court presumes, may result in a recruitment fee to Defendant for achieving the match and actual hire by Defendant's client. The court notes that the screenshots of the source of Defendant's text messages only provide a general description of the putative job opportunity, not the name of the prospective employer's other contact information. If interested, the recipient of Defendant's text message is, based on Plaintiff's screenshots of Defendant's alleged calls, directed to contact the telephone number provided by Defendant's text message, which, according to Plaintiff, is designated to SmartSearch.

Based on the court's review of the press release, while it is possible that SmartSearch includes an autodialer function that can be used by Defendant to communicate the job possibility at issue, in a text message prepared by Defendant, to the job-seeker recipient of the message, once the SmartSearch platform has identified the potential job-seeker, as Plaintiff alleges occurred with respect to the job opportunity described in the screenshots, such possibility is not apparent on the face of the press release. Rather, the press release's description of Defendant's involvement with SmartSearch suggests SmartSearch enables Defendant to efficiently survey Internet postings by job seekers as to their work experience or training, and the geographic proximity of the putative job opportunity to the job seeker's residence as Defendant

asserts occurred as to Plaintiff.  Nor does the press release support Defendant's assertion, Dkt. 13 at 12, that Superior personnel "individually and manually inputted into the SmartSearch platform the telephone number to which the employment opportunity messages are to be sent."  Instead, the press release indicates the platform allows "the flow of critical information <u>from</u> SmartSearch into [Superior's] SAP," which could be used to compile a list of cell numbers to be contacted by Defendant.  Dkt. 13-1 at 1.  In sum, the court finds the description of the SmartSearch platform allegedly utilized by Defendant in connection with sending the messages to Plaintiff neither establishes nor necessarily excludes the possibility it has the capability to function as an autodialer.  That, as Defendant states, "it is the SmartSearch platform . . . and the Superior employees' personal and targeted use of it which makes it not an ATDS as a matter of law," Dkt. 5-1 at 17, and does not preclude Defendant's use of autodialer to communicate with Plaintiff as a component of the SmartSearch platform or a separate function in Defendant's computer system.  Whether Plaintiff has plausibly alleged Defendant used an ATDS to contact Plaintiff based on the data received from Defendant's use of the SmartSearch platform therefore must be assessed by other indicia of such use as alleged in the Complaint.

In answering this question, courts "require plaintiffs to allege facts that would allow for a reasonable inference that an ATDS was used . . . including that text messages were sent from a 'short code' phone number [of] generic impersonal content and the <u>volume</u> or timing of the calls or messages."  *Krady*, 2017 WL 6541443, at *4 (citing *Flores v. Adir Int'l, LLC*, 685 Fed.Appx. 533, 2017 WL 1101103, at *1 (9th Cir. Mar. 24, 2017) (use of an ATDS reasonably inferable from facts that plaintiff received

four identical text messages, the messages continued after plaintiff requested the sender, defendant, to stop, the text of the messages were "generically formatted and appeared to be scripted," and the texts were sent by "SMS short-code which are typically associated with automated services").[16]  In applying these factors, courts consider "the difficulty of pleading facts regarding the technology used to make a call or send a text message absent discovery."  *Krady*, 2017 WL 6541443, at *3 (citing caselaw); *see also McCabe v. Caribbean Cruise Line, Inc.*, 2014 WL 3014874, at *4 ("Claims based on alleged violations of the TCPA . . . need not be pled with particularity.") (citing caselaw).

Here, several allegations in the Complaint are relevant to whether Plaintiff has demonstrated a reasonable, *i.e.*, plausible, inference that the text messages were sent via an autodialer as required by the TCPA.  First, the substance of the messages describing a "material handler/production operator" job in a specific location, Buffalo Grove, contradicts the idea that the messages represent a personalized, as asserted by Defendant, Dkt. 5-1 at 16; Dkt. 13 at 9-10, rather than a generic or scripted message as Plaintiff contends, Dkt. 9 at 5 ("Defendant's text messages were impersonal and generic").  Here, the message is not addressed to any person and certainly not to Plaintiff as indicated by the absence in the first message's salutation, "Hi," to Plaintiff's name, such as "Hi Samantha."  Thus, on its face, the text could easily have been sent to a wide range of individuals whom Defendant had identified, through SmartSearch's search of outside on-line job sites, to solicit with some proximity to the potential job.

---

[16]   SMS is an abbreviation for "'short message service (SMS) calls.'"  *Krady*, 2017 WL 6541443, at *3 (quoting *In Re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991*, 18 F.C.C. Recd. 1404, 14115 (2003)).

Significantly, Plaintiff's allegations, particularly that Plaintiff received in excess of 240 text messages since the beginning of 2018, over a six-month period, regarding the Buffalo Grove job, Complaint ¶ 4, with 210 being received in one day, July 10, 2018, Complaint ¶ 18, despite Plaintiff's sending to Defendant two text messages requesting Defendant stop, Complaint ¶ 19, a likely futile response given that, as Plaintiff alleges, Complaint ¶ 11 n. 3, Defendant had then designated the only response number, the 844 number, Defendant imposed a text only restriction as to use of this line, preventing Defendant from receiving Plaintiff's requests to cease sending her the messages, that Plaintiff continued to receive the same message, now including an additional, specific telephone number for Ms. Jones at Superior to call should Plaintiff have an interest, Complaint ¶ 20, are also consistent with use of an autodialer and a basis upon which to reasonably infer Defendant's use of an autodialer. *See Flores*, 685 Fed.Appx. at 533 (continued sending of text messages after plaintiff requested defendant cease from doing so evidences use of an autodialer); *Krady*, 2017 WL 6541443, at *5 (plaintiff's asserted 36 text messages received from defendant supports sufficiency of plaintiff's ATDS allegation). That, as Plaintiff also alleged, the calls continued in large numbers over the course of the day, July 11, 2018, is a further indication of use of an autodialer based on the "regularity and persistence" of such calls. *Krady*, 2017 WL 6541443, at *4. Defendant's effort to establish that the job opportunity which was the subject of the text messages was tailored to Plaintiff's "purported skill set," Dkt. 5-1 at 12, and "within her geographic location," *id.*, as well as Defendant's assertion, Dkt. 5-1 at 5, that Plaintiff "uploaded a copy of her resume, with her phone number, to www.careerbuilder.com, are all factual assertions not including in the Complaint, and

thus outside the scope of the court's review of Defendant's Rule 12(b)(6) motion to dismiss. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact") (citing *Leonard F.V. Israel Discount Bank of New York,* 199 F.3d 99, 107 (2d Cir. 1999) (court's consideration of defendant's Rule 12(b)(6) motion to dismiss limited to consideration of facts stated on face of complaint and may not credit assertion in defendant's moving papers unless motion is converted to summary judgment with plaintiff given the opportunity to contest asserted facts)).

Common sense also supports a reasonable inference that if Defendant's system did not include use of an autodialer, a Superior employee responsible for making the calls, upon receiving (assuming Defendant's 844 number could even receive an in-coming text message from Plaintiff) Plaintiff's negative response and requests to stop sending, as alleged, the messages through the SmartSource telephone number provided by Defendant, would have stopped sending the messages rather than to incur Plaintiff's displeasure prompting Plaintiff to invoke the TCPA. In this case, that such termination of the calls to Plaintiff did not occur, allegations the court is required on Defendant's motion to dismiss to treat as true, *Biro,* 807 F.3d at 544, is another plausible indicator that an autodialer was employed by Defendant in effecting transmission of the multiple messages to Plaintiff. Further, it is also unrealistic to conclude that for this job solicitation, Defendant's responsible employee (Amy Jones) or other employees were directed to physically initiate, without use of an autodialer, over 210 calls to Plaintiff in one day as the Plaintiff's screenshots indicate, in fact occurred, Complaint ¶¶ 18-20, again supporting a reasonable inference that an autodialer was

used by Defendant in sending Plaintiff the unwanted voluminous solicitations. *See Flores,* 685 Fed.Appx. at 533 (upholding TCPA complaint alleging four (4) unwanted text messages and at least three (3) additional messages after requesting defendant cease sending them); *Krady*, 2017 WL 6541443, at *4 (TCPA complaint alleging thirty-six (36) text messages of a commercial nature without plaintiff's consent over three-day period supports inference of ATDS use).

Although the definition of an ATDS includes the "capacity to store or produce telephone numbers to be called, using a random or sequential number generator," 27 U.S.C. § 227(a)(1)(A), for a valid TCPA claim under § 227(b)(1)(A)(iii) it is unnecessary to allege that such capacity was in fact utilized by the accused equipment. *See King,* 894 F.3d at 480 & n. 7 (acknowledging the legislative history of the TCPA "confirms what the language of the statute makes clear in any event: that the TCPA applies to calls from a device that *can* perform the functions of an autodialer, regardless of whether it has actually done so in a particular case," and citing cases); *Flores*, 985 Fed.Appx. at 543 (for TCPA liability it is not necessary that the autodialer "deal numbers or send them 'randomly'"); *Keim v. ADF Midatlantic, LLC*, 2015 WL 11713593, at *3 (S.D.Fla. Nov. 10, 2015) ("*Keim*") (stating "equipment that has the capacity to store or dial random or sequential numbers falls within the TCPA's scope <u>even</u> <u>if</u> <u>that</u> <u>capacity</u> <u>is</u> <u>not</u> <u>used</u> and instead the telemarketer programs the equipment with a set list of numbers to be dialed"). As the court in *Keim* noted, the absence in the Act of FCC regulations of a requirement that the device utilized by a defendant actually make use of the required random generator is to assure that "the prohibition on autodialed calls not be circumvented," *Keim*, 2015 WL 11713593, at *3 (citing *In re Rules & Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd. 14014, 14092-93, 2003 WL 21517853), such as the circumstance where a defendant could easily assert that, in sending or making the unwanted calls or messages, defendant did not in fact use the autodialer feature in the device and thereby defeat TCPA liability).

Another indicator supporting an inference of an autodialer use is that the sender's phone number, this one associated with SmartSearch as Plaintiff alleges, Complaint ¶ 11 n. 2, is a so-called "short-code."[17]  *Krady*, 2017 WL 6541443, at *4. However, unlike the facts in *Krady*, Plaintiff has alleged Defendant's system utilized a "long-code," Complaint ¶ 24, which Plaintiff asserts is nevertheless "consistent with the use of an automatic dialing system to send text messages."  Complaint ¶ 24.  Although autodialed messages are more typically sent using short-code numbers, *Flores*, 685 Fed.Appx. at 533 ("the texts came from an SMS short code which are typically associated with automated [autodialer] services"), a long-code telephone line number can also support use of an autodialer.  *See* Dave Roos, *How Automatic Dialers Work*, https://electronics.howstuffworks.com/automatic-dialers.htm, *last visited* June 26, 2019 (noting that among four prerequisites for an autodialer to function is the need for "an active telephone line" without any requirement the line be either for short-code or long-code numbers).  Thus, text messages from an autodialer can also be sent using a long-code, and Plaintiff's allegation, Complaint ¶ 11 n. 3, that the 844 phone number, a 10-digit long-code number associated with SmartSearch, was then used by Defendant as an exclusive line for sending, *i.e.*, outgoing, text messages to Plaintiff, sufficiently

---

[17]   A short-code is a six-digit number that allows "high-volume, application driver messaging."  Twilio Support WHY USE A SHORT CODE INSTEAD OF A LONG CODE?  https://support:twilio.com, *last visited* June 26, 2019.  Long-codes are meant for person-to-person communications and can send only 1 message per record; short-codes can send 100 messages per second.  *Id.*

alleges Defendant's use of the 844 long-code number is consistent with use of an autodialer. *Id.* Thus, while use of a short-code is more closely correlated with use of an ATDS, given the nature of Defendant's business, which seeks to induce the recipient of Defendant's job-related text messages to contact Defendant, it is plausible that to avoid creating an adverse impression upon a recipient of Defendant's text message that Defendant's calls came from an autodialer anonymously seeking out recipients to apply for a specific job, Superior elected to use the long-code, the 844 number, instead of a short-code number that would be more indicative to the recipient of use of autodialer, one nevertheless technically capable of transmitting calls by an autodialer. Therefore, in the context of Defendant's business of sending recruitment messages, it is a reasonable inference, as Plaintiff alleges, that the long-code number associated with an out-going text messaging only line was used by Defendant to support the use of an autodialer, despite the absence of an alleged use of a short-code number, a factor more typically aligned with use of an ATDS.

Defendant's unsupported assertion that the multiple unwanted messages received by Plaintiff after Plaintiff requested they cease could be attributed to "carrier error" or "other technical defect," Dkt. 5-1 at 16, or was "likely the result of her own phone carrier issue," Dkt. 13 at 8, is a matter for an affirmative defense, and thus irrelevant to the consideration of Defendant's motion to dismiss which limits the scope of the court's consideration to the allegations of the Complaint. *Leonard F.*, 199 F.3d at 107. Moreover, whether the carrier's or Defendant's message logs reveal the voluminous calls received by Plaintiff resulted from a technical error by Plaintiff's carrier, as Defendant claims, or not, is a question that should be left to pretrial discovery. Thus,

Plaintiff's allegations support a reasonable inference that the voluminous, non-personal text messages for Defendant's recruitment business sent repeatedly and persistently over a single-day, and prior thereto, to Plaintiff, using a long-code telephone number for outgoing text messages only, despite Plaintiff's attempts to get Defendant to stop them, plausibly demonstrates Defendant's use of ATDS in violation of the TCPA.

Defendant's argument, Dkt. 5-1 at 15-17; Dkt. 13 at 9-11, that individual targeting of a message recipient negates any inference that an ATDS was used by Defendant is also without merit. Defendant's reliance for this proposition on *Duguid v. Facebook, Inc.*, 2016 WL 1169365, at **4-5 (N.D.Cal. Mar. 24, 2016) ("*Duguid* I'), Dkt. 5-1 at 15-16; Dkt. 13 at 10-11, is misplaced. In *Duguid* I, the court found that where the "content" and "context" of the message indicate the message, which notified recipients, including plaintiff, of a "login" to their respective Facebook accounts, was the result of defendant's "individual" or "direct targeting," of the plaintiff, or, as Defendant asserts, "suggesting targeted or customized messages," Dkt. 13, plaintiff's allegation that the message was sent by an ADTS was found insufficient and accordingly the court dismissed the complaint. In reaching its conclusion in *Duguid* I the court mainly relied on *Flores v. Adir Int'l, LLC*, 2015 WL 4340020, at *3 (C.D.Cal. July 15, 2015) ("*Flores*"), which found that defendant's text messages to plaintiff for the purpose of collecting a debt, which did not include plaintiff's name but stated specific reference numbers suggestive of overdue accounts, indicated the defendant had "'expressly targeted'" plaintiff such that the defendant's calls were therefore not random but were "directed specifically toward [p]laintiffs," and thus failed to plausibly infer use of an autodialer. *Duguid I*, 2016 WL 1169365, at *5 (internal citation and quotation marks omitted). However, in *Flores,* on

appeal, the Court of Appeals rejected the *Flores* trial court's reasoning.  *See Flores*, 685

Fed.Appx. at 534 (the TCPA does not require the alleged unwanted calls be randomly

dialed, only that the defendant "make any call . . . using any [autodialer]," 47 U.S.C. §

227(b)(1)(A), defined as "equipment which has the capacity – (A) to store or produce

telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers.").  *Id.* (quoting 47 U.S.C. § 227(a)(1)).  According to the Ninth

Circuit, in *Flores* the district court erroneously dismissed plaintiff's complaint because

plaintiff's allegations "'suggest direct targeting that is inconsistent with the sort of

random or sequential number generations required for an ATDS'" and "because they

[plaintiff's allegations] suggest that 'Defendants [*sic*] attempts to contact . . . [plaintiff]

were anything but 'random.'"  *Flores*, 685 Fed.Appx. at 534.   As the appeals court, in

rejecting the district court's reasoning, stated "[h]owever, dialing equipment does not

need to dial numbers or send text messages 'randomly' in order to qualify as an ATDS

under the TCPA.  Rather, in the words of the court, 'the statute's clear language

mandates that the focus must be on whether the equipment [used to make the calls]

has the *capacity* 'to store or produce telephone numbers to be called, using a random or

sequential number generator'.'"  *Id.* (quoting *Satterfield v. Simon & Schuster, Inc.*, 569

F.3d 946, 951 (9th Cir. 2009) (quoting 47 U.S.C. § 227(a)(1))) (italics in original).  Thus,

in *Flores,* the Ninth Circuit found that plaintiff's allegations of receiving identical text

messages on four separate occasions, plaintiff's continued receipt of such messages

after plaintiff's request to defendant that they be stopped, the absence of identification

of plaintiff as the intended recipient, and the defendant's using an "SMS short code

which is typically associated with automated [text messaging] services," *id.* at 533,

"drawing on the court's 'judicial experience and common sense, . . .'" reasonably inferred 'the equipment [used by defendant] has the *capacity* to 'store or produce telephone numbers to be called, using a random or sequential number generator' even if it was not presently being used for that purpose." *Id.* at 534 (quoting *Iqbal*, 566 U.S. at 679, and *Satterfield*, 569 F.3d at 951)).  Significantly, following the Court of Appeals' decision in *Flores,* district courts in the Ninth Circuit acknowledged that the Ninth Circuit "implicitly rejected" the reasoning of lower courts' dismissals of plaintiffs' TCPA claims based on so-called "direct targeting that is inconsistent with the sort of random or sequential number generation required from an ATDS."  *See, e.g., Brickman v. Facebook, Inc.*, 2017 WL 1508719, at *3 (N.D.Cal. Apr. 27, 2017) (citing *Flores* and contrasting the Ninth Circuit's *Flores* holding with the district court's analysis in *Duguid I*; *see also Marks v. Crunch San Diego LLC,* 904 F.3d 1041, 1043 (9th Cir. 2018) ("we conclude that the statutory definition of ATDS includes a device that stores telephone numbers to be called whether or not those numbers have been generated by a random or sequential number generator"); *King*, 894 F.3d at 477 ("the term 'capacity' [in § 227(a)(1)] is best understood to refer to the functions a device is currently able to perform, whether or not those functions were actually in use for the offending call . . .."); *Krady*, 2017 WL 6541443, at *4 (finding short-code messages of a generic or impersonal content, along with the "volume or timing of the calls or messages" sufficiently stated a violation of the TCPA based on the use of an ATDS, without regard to the randomness or lack thereof of the calls) (citing *Flores*, 2017 WL 1101103, at *1).  Thus, the court in *Duguid* I*,* relying on the district court's decision in *Flores,* later reversed by the Ninth Circuit, found that, like the facts in *Flores,* because the login

notifications sent to plaintiff by defendant, without any request from plaintiff that defendant do so, were text messages "targeted to specific phone [plaintiff's] numbers and are triggered by attempts to login to [plaintiff's] Facebook accounts associated with those phone numbers," *Duguid I*, 2016 WL 1169365, at *5, the login text messages from defendant Facebook were not sent by an ATDS nor did plaintiff "suggest [defendant] sends text messages en masse to randomly or sequentially generated [cell phone] numbers," *id.,* and so dismissed the complaint for those reasons.  Therefore, to the extent Defendant relies on *Duguid* I to support its attack on the Complaint for insufficiently alleging use of an ATDS on the ground Plaintiff's allegations show that Defendant's calls were "targeted" to Plaintiff as a response to Plaintiff's supposed posting of her resumé to an internet job board, an assertion not included in the Complaint and a required subject for an affirmative defense, such reliance is severely, if not completely, undercut, by the Ninth Circuit's rejection of the district court's incorrect reading of the TCPA in *Flores,* to exclude, from the scope of the Act's definition of an ATDS, so-called "targeted" messages, or  messages "triggered" by action of a third-party, *id.,* at *5, as inconsistent with random calls, and, by necessary implication, a rejection of the same rationale as used in *Duguid* I to dismiss a TCPA complaint. Defendant also relies, Dkt. 13 at 5, 9-10, on *Duguid v. Facebook, Inc.*, 2017 WL 635117, at *4 (N.D.Cal. Feb 16, 2017) ("*Duguid* II"), *rev'd*, __ F.3d __, 2019 WL 245483, at *3 (9th Cir. June 13, 2009) (finding plaintiff had sufficiently alleged defendant had sent messages to plaintiff using an autodialer), for the same proposition, *viz.* that "direct targeting" of Plaintiff is "inconsistent" with use of an ATDS).  *Id.* (citing *Flores* 2015 WL 4340020, at *4 (C.D.Cal. July 15, 2015) (dismissing plaintiff's amended complaint which

included an "allegation of customized protocols and unique codes" showing the defendant's "messages were sent through direct targeting that is akin to *Flores*.")). As is apparent from its date, the court's decision in *Duguid* II, preceded by approximately one month the Ninth Circuit's reversal of *Flores* on March 24, 2017 and thus *Duguid* II is also unpersuasive authority in the instant case on this issue. Moreover, court decisions from outside this district are not binding on this court. *See Scharr v. Selective Insurance Company of New York*, 2017 WL 4778779, at *7 (W.D.N.Y. Oct. 23, 2017) (determining that even if case from a sister circuit on which the plaintiff relied were on point, this court was not bound by it, especially in light of "the Second Circuit's clear directive" on the issue).

For the same reason, the erroneous supposition that non-random, *i.e.*, "targeted" or "customer-specific" text messages, which Defendant maintains are the type of calls alleged in this case, cannot support use of an autodialer, Defendant's reliance, Dkt. 5-1 at 16; Dkt. 13 at 10, on *Gragg v. Orange Cab Co. Inc.*, 2013 WL 195466, at *2 (W.D.Wash. Jan. 17, 2013) ("*Gragg* I") (dismissing TCPA complaint for failure to reasonably allege defendant's use of an ATDS based on plaintiff's request for defendant's taxi services which resulted in defendant's "customized" solicitation for a free "app" to facilitate plaintiff's requests for future taxi services that court found were sent by "customer-specific text" . . . through human agency, rather an ATDS") is unavailing. By the same token, Defendant's reliance (Dkt. 5-1 at 18) on the second, later, decision in the *Gragg* case, *Gragg v. Orange Cab Co. Inc.*, 2014 WL 494862, at *3 ("*Gragg* II") (W.D.Wash. Feb. 7, 2014) (granting partial summary judgment, based on the court's finding that defendant's modem was not a ATDS) is also mistaken, as the

solicitation messages at issue – an invitation to plaintiff to download a "TaxiMagic smartphone app" – in *Gragg* I and II could only be sent to plaintiff if plaintiff activated the "accept" prompt on defendant's system, thereby triggering the sending of the message and thus negating, through plaintiff's human intervention, any use of defendant's system so as to constitute use of an autodialer for purposes of plaintiff's TCPA claim, and no evidence supported that defendant's modem had any present capacity to generate random or sequential numbers to be called.  Here, in contrast, Plaintiff's allegations do not suggest Plaintiff, prior to Defendant's decision to send messages to Plaintiff, interacted with Defendant in any way to trigger Defendant's sending of the messages at issue; further, accepting, as required, Plaintiff's allegations as true, *Biro*, 807 F.3d at 544, after Plaintiff's request that Defendant cease sending *viz.* "spamming," Complaint ¶ 19, the messages at issue continued with the many, if not most, of the 210 unwanted messages being sent after Plaintiff's request that Defendant cease and desist sending them at 12:43 p.m. on July 8, 2018.  *Id.*  That because Defendant had designated the 844 number for outgoing text messages only thus potentially rendering Plaintiff's attempt to get Defendant to cease sending the messages, *see* Discussion, *supra*, at 27, futile does not weigh against Plaintiff as Plaintiff alleged she attempted to contact Defendant using the 844 number, the only number provided by Defendant at that point. Additionally, the court's grant of summary judgment in *Gragg* II followed, in contrast to the present case, plaintiff's discovery of the exact technical operation of defendant's text messaging equipment.

Defendant's additional reliance (Dkt. 5-1 at 15) on *Weisberg v. Stripe, Inc.*, 2016 WL 3971296, at * 4 (N.D.Cal. July 25, 2016), and *Knutson v. Reply!, Inc.*, 2011 WL

291076, at *2 (S.D.Cal. Jan 27, 2010 ("*Knutson*") (Dkt. 5-1 at 16) is also misplaced.  In *Weisberg*, the court dismissed plaintiff's TCPA complaint on the ground the plaintiff's allegations failed to plausibly show the defendant's text messages were "sent randomly to him by an ATDS."  *Weisberg*, 2016 WL 3971296, at *4 (N.D.Cal. July 25, 2016) ("*Weisberg*") (defendant's messages were "targeted response" to plaintiff's "voluntary release of a user's [plaintiff's] phone number," not the product of use of an autodialer) (citing *Duguid* II, 2017 WL 635117, at *6).  However, as discussed, Discussion, *supra*, at 37-38, in *Weisberg,* the court's rationale was, like that of *Duguid* II, based on an incorrect construction of the requirements for a TCPA claim under controlling Ninth Circuit law as later enunciated in *Flores* and *Marks*.  As such, *Weisberg* also provides no support for Defendant's contention that the Complaint fails to plausibly allege Defendant's recruitment messages were sent using an autodialer because Plaintiff's allegations do not plausibly demonstrate they were random, *i.e.* non-personal, in nature. Similarly, in *Knutson*, the court dismissed the plaintiff's TCPA complaint based on a lack of pleaded facts concerning the nature of the calls, which related to plaintiff's real estate business, alleged to violate the TCPA thus failing to plausibly establish the calls were generated by an ATDS or were "randomly generated or impersonal").  *Knutson*, 2011 WL 291076, at *2.  As explained, Discussion, *supra*, at 27-29, courts correctly hold the TCPA does not require a showing that the alleged calls were randomly generated in order to sufficiently allege the calls emanated from Defendant's use of an ATDS. Further, Plaintiff's allegations, including Plaintiff's screenshots of the calls, show none were addressed to Plaintiff personally, rather, they were merely sent to Plaintiff's cell phone number ostensibly (according to Defendant, not Plaintiff) obtained from a website

job-board, [www.careerbuilder.com](www.careerbuilder.com), which Defendant asserts, Dkt. 5-1 at 5, Plaintiff' may have utilized but, importantly, nevertheless without any prior contact with Defendant. Defendant's reliance on Plaintiff's alleged use of the internet job board is, as explained, Discussion, *supra*, at 27-28, outside the scope of the court's review on a Rule 12(b)(6) motion limited as it is to the Plaintiff's allegations. *See Leonard F.,* 199 F.3d at 107. Significantly, Defendant does not contend (nor can Defendant in the absence of discovery) that in sending the offending messages Defendant was even responding to Plaintiff's expressed interest in the particular job as proffered in Defendant's messages, *i.e.*, "material handler/production operator," Complaint ¶ 18, so as to suggest the prospective job for which Defendant solicited Plaintiff could even have been one plausibly of interest to Plaintiff thereby potentially constituting a personalized message, not a more generalized impersonal, *i.e.*, generic, message, as evidence of one sent by an autodialer to a disinterested recipient. Thus, correctly viewed, the Defendant's messages were both 'generic' and 'impersonal' in regard to Plaintiff's reason for utilizing the job board, even assuming Defendant's assertion of such use by Plaintiff proves, in fact, to be correct. Dkt. 5-1 at 5. Defendant's reliance, Dkt. 13 at 5, 9, on *Bodie v. Lyft*, 2019 WL 258050, at *2 (S.D.Cal. Jan 16, 2019), is similarly unavailing as in that case the complaint was "devoid of facts that could support a reasonable inference" defendant had used an autodialer. In contrast, here Plaintiff alleges numerous relevant facts including the messages' impersonal nature, their voluminosity, regularity and persistent transmission, relevant factors supporting a reasonable and plausible inference Defendant used an autodialer. Thus, notwithstanding Defendant's vigorous arguments, allegations that text messages were directed to a particular plaintiff does not avoid a

reasonable inference that such messages were nevertheless sent by an autodialer where other relevant indicia such as genericness, volume, regularity, and persistence of the messages are present as alleged by Plaintiff.  *See Krady*, 2017 WL 6541443, at *4; *see also Duguid,* __ F.3d.d __, 2019 WL 2454853, at *3 (sustaining sufficiency of allegation that defendant used autodialer to send "messages that appear personalized").

Nor is there any merit to Defendant's contention that in this case "human intervention" negates any reasonable inference that Defendant sent the messages to Plaintiff using an ATDS.  Dkt. 5-1 at 17-18 (citing cases); Dkt. 13 at 5 ("press release shows high degree of human intervention"), 12-13 (citing 2015 Order, 30 FCC Rcd. at 7975, 2015 WL 4387780 ("the 2015 FCC Order") ("the basic function of an autodialer is the ability to 'dial numbers *without human intervention*, and "'dial[ing] thousands of numbers *in a short period of time*'") (italics added by Defendant).  This contention fails for several reasons.  First, in its 2015 Order, the FCC while adhering to its past definition of an autodialer, also explained, "[h]ow the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination."  *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 (2015), 2015 WL 4387780, at *8 (quoted in *Keim*, 2015 WL 11713593, at *4).  "Accordingly, equipment may be an autodialer despite the fact that it does not have the capacity to dial numbers without human intervention, but this lack of capacity may defeat a TCPA claim 'based on how the equipment functions and depends on human

intervention.'" *Id.* (quoting the 2015 F.C.C. Order). Defendant's argument, predicated on a demonstration of so-called "human intervention" in the process of effectuating unconsented text messages alleged by Plaintiff, thus ignores the fact that such a detailed functional understanding as to the technical operation of exactly how Defendant's equipment used to communicate with Plaintiff functions in relation to any required "human intervention" is not presently available to either Plaintiff or the court at this stage in the case as the Plaintiff has not had any opportunity for discovery directed to this issue. Second, Defendant's assertion that the press release's description of the SmartSearch "platform indicates that the text message[s] may be sent [by Defendant] to [cellular telephone] numbers that are individually and manually inputted into the SmartSearch platform by a Superior employee or human user," Dkt. 13 at 12-13, is not supported by an affidavit by a person with personal knowledge of the actual facts regarding the design and operational characteristics of the SmartSearch platform, *see Fonte v. Bd. of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleadings for purposes of Rule 12(b)."), nor does a fair reading of the press release itself support Defendant's assertion of the extent of human intervention in the sending of the text messages to Plaintiff. *See* Dkt. 13-1 (*passim*). Specifically, as discussed, Discussion, *supra*, at 23, the press release's description of the SmartSearch platform indicates it enables Defendant to "<u>post</u> job [opportunities] to many external sites . . . and <u>search</u> their data bases." Dkt. 13-1 at 1. According to the press release, the platform also "facilitates the flow of critical information <u>from</u>

SmartSearch into [Superior's] SAP [an internal business software application][18] and enables Superior to engage in standard forms of internet communications such as email, voice, and text messages." *Id.* Thus, contrary to Defendants' representation regarding Defendant's use of the SmartSearch platform, the press release's description, does not state that Defendant's employees "input[ ] cell numbers of job seekers like Plaintiff into SmartSearch," Dkt. 13 at 12-13; rather, it more reasonably suggests SmartSearch sends such information to Superior's computer system and thus facilitates identification of a candidate like Plaintiff for outgoing text messaging solicitations by use of an autodialing function. How Defendant's messages to a job prospect such as those sent to Plaintiff using a dedicated cell telephone line as Plaintiff alleges (which Defendant does not dispute) were actually sent by Defendant to Plaintiff is simply not explained in the press release. Although an autodialing capability may be a feature of the SmartSearch platform, a colorable possibility suggested by the fact that the 845 number is one associated with SmartSearch, as Plaintiff alleges, it is equally possible that an autodialer function software package also is available in Defendant's computer system apart from Defendant's use of SmartSearch. Interestingly, Defendant's assertion in opposition states that cell numbers of prospective job candidates are manually "inputted" into the SmartSearch platform by Defendant's employees, Dkt. 13 at 12, thereby indicating the recipient's cell numbers are, at such point, not manually dialed by Defendant's employee to send through "human intervention" Plaintiff text messages, but are "inputted," as Defendant describes its process, into a computer program, SmartSearch, used by Defendant, one capable of functioning as an autodialer

---

[18] Discussion, *supra*, at 23, n. 13.

either independently or in conjunction with a combination of autodialer software and hardware available in Defendant's computer system. Thus, although Plaintiff's reliance on the press release for description of the functionality of the SmartSearch platform does not itself support an inference of Defendant's use of an ATDS, it also does not, contrary to Defendant's contention, negate such plausible use by Defendant to send Plaintiff the offending messages sufficient to support Defendant's motion to dismiss. Plaintiff's plausible allegation of Defendant's use of an autodialer also renders Defendant's contention, Dkt. 5-1 at 17, that Defendant's messages were not sent "en masse" as Plaintiff alleged, Complaint ¶ 12, without merit as use of an autodialer by definition implies the messages were sent "en masse." *See Keim*, 2015 WL 11713593, at *4 (use of autodialer permits sending unwanted text messages "en masse"). Moreover, neither the TCPA, § 227(b)(1)(A)(iii) nor § 64.1200(a)(1)(iii) require plaintiff to establish the text messages were in fact sent "en masse," to properly allege Defendant's TCPA liability.

The caselaw on which Defendant relies (Dkt. 5-1 at 17-18) to support its contention that where human intervention is required to (1) select a cell number to be called, (2) draft the message to be sent, (3) select the time to send the message, and (4) initiate the actual transmittal of the message, the alleged use of an autodialer is thereby defeated, like Defendant's other authorities, are inapposite. In *Luna v. Shac, LLC,* 122 F.Supp.3d 936 (N.D.Cal. 2015) the court determined, after discovery and on summary judgment, that defendant's creation and sending of the messages at issue – an invitation to participate in activities at a "gentlemen's club" – were accomplished by a person, not an automated messaging device, and so did not constitute an ATDS. *Luna*,

122 F.Supp.3d at 941-42.  Although the TCPA refers only to the "mak[ing] of a call," not the preparation of the underlying message or selection of the target cell number, *see* § 227(b)(1)(A)(iii), as the Act prohibits, nevertheless, in *Luna*, the court found the evidence sufficiently established the alleged calls were made by a person and thus not an autodialer as prohibited by § 227(b)(1)(A)(iii).  In this case, the question before the court concerning the Complaint's sufficiency is raised by Defendant's Rule 12(b)(6) motion, without discovery, which prevents the court from assessing whether the sending of the message in fact resulted from an ATDS as Plaintiff alleges, or human, not machine, intervention, as Defendant asserts.  As noted, Discussion, *supra*, at 41-42, Defendant's description of the "inputting" of telephone numbers fairly implies the targeted cell numbers, including Plaintiff's, to be called by Defendant were placed in the memory of a computer, rather than manually "dialed" directly by Defendant's employee on a cellular phone or land-line, thus making the eventual call itself amenable to autodialing available within the Defendant's computer system, as a result of interfacing with the data collected and downloaded to Defendant's computer system by SmartSource platform, the exact details of which cannot be readily deduced from the press release's description.  Thus, the *Luna* case does not support Defendant's motion to dismiss on this issue.  Likewise, in *Glauser v. GroupMe, Inc.*, 2015 WL 475111, at *1 (N.D.Cal. Feb. 4, 2015), plaintiff complained that defendant had sent two unwanted text messages inviting his participation in on-line poker games.  In granting summary judgment after discovery, the court found the text messages at issue were initiated by third-party group members who added plaintiff's cell number to the group's group "messaging application," *Glauser*, 2015 WL 475111, at *1, and "routed" to plaintiff the

unwanted messages, formulated by an anonymous person described as the "group creator," using defendant's internet platform, and, because of the presence of significant human – the "group creator's" – involvement in initiating the calls at issue, therefore did not demonstrate the messages were sent by an autodialer. *Glauser,* 2015 WL 475111, at *6. In contrast, the present case as noted, is before the court on Defendant's Rule 12(b)(6) motion without the benefit of discovery into the technical details of Defendant's computer system including how the text messages at issue were formulated and sent by Defendant via cell phone text message calls. Further, Plaintiff's allegations do not suggest that even if Plaintiff had utilized a job seeker's website such usage was an open invitation to Defendant to inundate Plaintiff with hundreds of unwanted solicitations without Plaintiff's prior express consent or to persist in sending them despite Plaintiff's requests (perhaps futile) to stop. Defendant's contention that the press release shows that the messages were formulated and sent by one of Defendant's employees without any use of an ATDS accordingly stretches credulity beyond the breaking point. It is simply implausible that Defendant directed its assigned employee, Amy Jones, to manually dial Plaintiff over 200 times during a single work day, July 8, 2018, during business hours as Plaintiff alleges as documented by Plaintiff's screenshots which strongly infer that the voluminous calls were made by use of an autodialer albeit using a long-code telephone number. To the contrary, Plaintiff's allegations, as well as Defendant's asserted facts describing how the messages were in fact generated, are substantially consistent with Plaintiff's allegation of the plausible use by Defendants of an ATDS. As with the preceding cases, *see* Discussion, *supra*, at 36-37 in *Gragg* II, 2014 WL 494862, at *3, a case also decided on summary judgment, the court found no

use of an autodialer because the customer, plaintiff, triggered the texted taxi dispatch notification message by pressing a cell button on his phone to accept the defendant's message demonstrating a degree of human intervention sufficient to negate the disputed call was sent by an autodialer. *Id.* Here, the case is before the court on a Rule 12(b)(6) motion and nothing in Plaintiff's allegations reasonably imply the calls were the result of some form of an affirmative action by Plaintiff, in directly interacting with Defendant, as Defendant's asserts, causing the messages to be sent by Defendant at the times they were in fact sent. Thus, the alleged facts by Plaintiff do not remotely resemble those in *Luca, Glauser* or *Gragg* I & II*,* or the substantive issues presented in such cases, as relied on by Defendant.

Finally, Defendant contends that Plaintiff's allegations fail to show that the number of calls to Plaintiff's cell phone were sufficiently large to plausibly support Defendant's use of an ATDS. Dkt. 13 at 11-12 (citing cases). There is, however, no minimum number of unwanted calls required by the TCPA necessary to sustain a plaintiff's alleged use of an autodialer as plausible and Defendant cites no authority in support of this further proposition. *See, e.g., Flores*, 685 Fed.Appx. at 533 (four text messages sent to plaintiff with other indicators sufficiently alleged use of an autodialer); *Krady*, 2017 WL 6541442, at *4 (allegation of more than 30 messages sent to plaintiff between January and October 2012 with screenshots of three text messages from defendant sent on January 19, 26 and 30, 2012 together with other indicia sufficient to reasonably infer defendant's use of an ATDS).

The cases upon which Defendant (Dkt. 13 at 11-12) additionally relies do not support Defendant's contention. In *Curry v. Synchrony Bank, N.A.*, 2015 WL 7015311,

at *2 (S.D.Miss. Nov. 12, 2015) ("*Curry*") the court found plaintiff's alleged receipt of 190 unconsented collection phone calls insufficient to allege use of an autodialer where plaintiff failed to also allege presence of "'dead air,'" *i.e.*, a pause between when the person picks up the phone and a voice commences to speak, which the court found "generally indicative of the use of an autodialer." Here, Plaintiff alleges Defendant sent to Plaintiff throughout one day, beginning at 9:41 a.m. (Complaint ¶ 18) through 5:23 p.m. (Complaint ¶ 20) over 200 unwanted text messages, not telephone calls with a voice message, like in *Curry*, thus rendering the absence of "dead air" between the act of answering the phone call and hearing a human voice, *i.e.*, a collection agent, as indicative to an autodialer, a distinction entirely at odds with the alleged facts in the instant case. *Id.* (citing *Aikens v. Synchrony Fin. d/b/a Synchrony Bank*, 2015 WL 5818911, at *4 (E.D.Mich. July 31, 2015) (noting that plaintiff had failed to provide any details regarding the 101 alleged phone calls received from defendant to infer use of an ATDS), *report and recommendation adopted,* 2015 WL 5818860 (E.D.Mich. Aug. 31, 2015). Similarly, in *Jones v. NCO Fin. Services*, 2014 WL 6390633, at *2 (D.Mass Nov. 14, 2014) the court dismissed plaintiff's TCPA complaint alleging defendant made 700 calls over two years as insufficient to plausibly suggest use of an autodialer where plaintiff failed to provide any other facts indicative of autodialing usage, again entirely unlike the instant case where the 210 calls were received during a single day over approximately an eight hour period, supporting plaintiff's allegations which include several screenshots of the offending text messages. Likewise, in *McGinity v. Tracfone Wireless, Inc.*, 5 F.supp.3d 1337, 1340 (M.D.Fla. 2014) the court dismissed plaintiff's complaint alleging defendant called plaintiff 6,000 times in 45 days without use of a

prerecorded debt collection message while speaking with a caller as insufficient to reasonably infer defendant's use of an autodialer. In contrast, in the instant case, the text messages appeared continuously on Plaintiff's cell phone despite Plaintiff's effort to stop them. In *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 120 (3d Cir. 2018) the court affirmed summary judgment for defendant after expert discovery where plaintiff was unable to show with expert testimony that defendant sent 27,800 text messages to plaintiff over a 17-month period using an autodialer. Each of these cases is distinguishable from the instant case in that here Plaintiff received a large number of text messages, not voice telephone calls, in one day with a repetitive generic message to Plaintiff and included screenshots of such messages in the Complaint thus corroborating, unlike the cases cited by Defendant, the numerous messages in fact were received. Moreover, Plaintiff alleged that Plaintiff continued to receive the same message throughout the day, July 8, 2018, despite Plaintiff's requests sent to Defendant using Defendant's long-code number that they stop. Such factors represent materially different facts plausibly supporting Plaintiff's allegation that the text messages came from an autodialer used by Defendant. Thus, nothing in Defendant's cited cases demonstrates that courts require any particular minimum number of challenged calls to support an inference that an autodialer was used. In sum, Defendant's caselaw is inapposite on this issue. Accordingly, Defendant's contention that Plaintiff has failed to plausibly allege use of an autodialer is also without merit.

3.    <u>Defendant's Motion For a Stay of Discovery</u>.

As noted, Background, *supra*, at 2, Defendant also moves to stay discovery pending disposition of Defendant's motion to dismiss. Under Fed.R.Civ.P. 26(d)

discovery cannot commence before the parties have conducted the pre-scheduling conference required by Fed.R.Civ.P. 26(f) ("Rule 26(f)") unless authorized by the Federal Rules, court order or stipulation. As Defendant has not served an answer electing instead to proceed pursuant to Rule 12(b)(6), no scheduling conference in accordance with Fed.R.Civ.P. 16(b) has been calendared and thus no Rule 26(f) conference to develop a discovery plan or proposed case management order for the court has occurred. Defendant does not assert the parties stipulated to commence discovery. Thus, as required by Rule 26(d), in the absence of a stipulation or court order, both of which are inapplicable to the case at this time, there is no likelihood that any discovery requests by Plaintiff will be served until a decision on Defendant's motion to dismiss is rendered by the court. Accordingly, Defendant's motion is premature and as such should be DISMISSED.

## CONCLUSION

Based on the foregoing, Defendant's motion to dismiss (Dkt. 5) should be DENIED; Defendant should be directed to file its answer and the matter remitted to the undersigned for further pretrial proceedings.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated: June 27, 2019
       Buffalo, New York

Decision and Order as to
Defendant' s Motion to Stay

Based on the Discussion, *supra*, at 48-49, Defendant's motion to stay discovery

(Dkt. 15) is DISMISSED.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated:  June 27, 2019
        Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      June 27, 2019
            Buffalo, New York